**HENRY, Plaintiff-Appellant, v. HENRY, Defendant-Appellee.**

Ohio Appeals, Sixth District, Huron County.

No. 611. Decided May 11, 1951.

Young & Young, Norwalk, Garfield, Baldwin, Jamison, Hope & Ulrich, Cleveland, for plaintiff-appellant.

H. R. Freeman, Norwalk, for defendant-appellee.

(SKEEL, PJ, HURD, J, THOMPSON, J, of the Eighth District sitting by designation in the Sixth District.)

## OPINION

By THOMPSON, J:

This action was commenced in the Common Pleas Court of Huron County, by petition of the plaintiff wife, seeking divorce, custody of minor child and alimony. From the alimony, property and support provisions of the trial court's decree granting a divorce to the plaintiff, she has appealed to this Court on questions of law.

Plaintiff urges that the property and support provisions of the trial court's decree were grossly inadequate and inequitable. To decide this question, a somewhat detailed statement of the facts contained in the voluminous record becomes necessary.

The parties were married in 1924, shortly after the plaintiff graduated from Columbia University, and the defendant from the University of Illinois. At the time of the marriage, plaintiff's family was one of means. Defendant had worked his way through college and brought to the marriage no financial assets other than a Ford automobile and a few hundred dollars, but what he lacked in financial backing he apparently made up in ambition, willingness to work and initiative. For a wedding present, plaintiff's father gave the parties a home costing $5300.00 and when this home was sold in 1937 for $7500.00, the defendant testified he gave one-half of the proceeds to his wife and kept one-half for himself.

Prior to the engagement, the defendant was working in a near-by city. Shortly after the engagement, and a few months before the marriage, the defendant, having impressed himself upon his future father-in-law, the latter secured a more attractive position for the defendant with a manufacturing concern in which plaintiff's father was financially interested. Defendant's salary there at the time of the marriage was $165.00 per month. About two months after the marriage, plaintiff's father offered the defendant a position with the local telephone company of which he was president and principal stockholder. At this time, in 1924, what is referred to as the telephone company, actually comprised eight separate telephone companies with plant assets of approximately one and a half millon dollars, serving 15,648 customers.

Defendant's first position with the telephone company was selling advertising. Within a matter of months, the de-

fendant having shown aptitude and ability in the business, he was promoted by his father-in-law and given the title of assistant secretary and assistant treasurer. By 1927 he was secretary and treasurer for the eight companies which were operated as separate corporations out of one office. In that year these eight companies were merged into one telephone company and the defendant became assistant to the president as well as secretary and treasurer. Upon merger, the value of the total property and plant of the company was fixed by the Public Utilities Commission of Ohio at $3,360,600.00.

In 1929, defendant became General Manager. During the period of merging of the various telephone companies, and subsequently, as additional properties were purchased, the defendant with the active help and suggestion of his father-in-law, who was constantly buying stock for purposes of investment and control, had numerous opportunities to buy up stock of certain of the companies being purchased. . Defendant's Exhibit 21, and his testimony shows he acquired, for example, sixteen shares of local telephone company stock at $3.00 per share, and Wood County Telephone Company stock to the extent of 83-¾ shares at $3.00 per share, after his engagement and while working for his father-in-law, which investment he now values at $9975.00 as a result of conversion rights. The low prices at which he purchased and the great opportunity afforded the defendant may be gathered from the testimony in his deposition that as early as 1927 and while still obviously drawing a modest salary, he emerged from the merger with some 12,000 to 15,000 shares of stock in the new telephone company. With this start, and with additional buying of stock of the company, over the years, and the receipt of stock dividends and the exercise of stock purchase rights, the defendant today has reached the point at which he is the largest individual stockholder of the telephone company, owning outright a total of 31,781 shares of common stock and 219 shares of preferred stock of the telephone company. One of the transactions whereby defendant acquired the equivalent of 4050 shares will be subsequently examined in some detail.

Returning to plaintiff and her family situation, it is to be noted that plaintiff was one of five daughters, the other four of whom had married professional men; one a professor, another an engineer, another a dentist, another a lawyer. Of the sons-in-law, the defendant was the only one in business and it was natural for plaintiff's father to look to him to carry on the family business since he had no sons. Plaintiff's father, however, was always primarily interested in the welfare of his five daughters, and after his first wife's

death, being the then owner of the majority of the telephone company stock, he established five **inter vivos** trusts, one for each daughter and her heirs. These trusts were created on December 28, 1935. It is significant that before creating these trusts, plaintiff's father had a talk with the plaintiff to learn how matters were going with her and her husband, because he was debating whether to make the defendant one of the two co-trustees of these five trusts. Plaintiff's testimony on this subject is as follows:

"Dad came to me before he set up the trusts and said to me, 'Is everything going all right between you and Cap?' because dad had said to me at other times, 'I don't know how you do it, Alice, sometimes but you seem to go along with Cap fine.' I said, 'Dad, everything will be all right.'"

As a result of plaintiff's acquiescence, her father made the defendant and his lawyer son-in-law co-trustees of each of the five trusts. Each trust was substantially the same in terms, except for the different beneficiaries, each trust containing the same number of shares of telephone company stock, namely, 800 shares. Upon the father's death in 1937, his will added 820 shares to each trust, making 1620 shares in each. None of the trusts has ever had any other assets except telephone company stock, and the dividends accruing thereon. The co-trustees pay the respective income beneficiaries the quarterly dividends paid by the company. Under the terms of the trust set up for the plaintiff, the trust is to terminate only when both of the co-trustees have died, or when all of the telephone company stock in the trust has been sold, whichever shall be the first event to occur. The co-trustees are given authority to sell the stock, but permitted to make a sale of not less than all; the stock may not be sold in part only. No stock is to be distributed to any beneficiary prior to the decease of the two co-trustees. So far as the plaintiff is concerned, she receives the income during her lifetime, unless the trust terminates prior thereto on one of the two bases noted. Upon her death, if the trust is still in existence, the defendant is to receive one-third of all the income for his lifetime, or until the trust is terminated, but only so long as he remains the widower of the plaintiff. Plaintiff's children and grandchildren, **per stirpes**, are given all of the trust income not given to the plaintiff or her husband, until such time as the trust terminates. In case the trust terminates, the remainder is to vest in the plaintiff if she is at that time living, or, if she be then deceased, in her children and grandchildren. Meanwhile, plaintiff's rights under the trust are to income only. Any rights on her part in the corpus are purely contingent upon her surviving the

two co-trustees or upon the trustees selling the telephone stock as an entirety. If plaintiff dies before either event, her estate has no further interest in the trust income or the principal. Since the trust instrument contains no provision for removal of either of the co-trustees, the defendant, so far as the trust is concerned, continues as co-trustee even after divorce from the plaintiff.

Although at the time of the death of plaintiff's father in 1937, there were 1620 shares of telephone company stock in each trust, the telephone company on January 1, 1940, split its common stock ten for one. This increased the shares in the five trusts from 1620 to 16,200 shares each, making a total of 81,000 shares out of 142,000 shares outstanding. The shares of stock in these trusts thus able to be voted by plaintiff's husband and his co-trustee, the lawyer husband of another sister, constituted 57% of all voting stock of the company and guaranteed effective control of the company. The company had been successful during the lifetime of plaintiff's father, and after the latter's death in 1937 the company continued to grow with the defendant as General Manager and the lawyer brother-in-law as President. In 1941, the defendant, as a reserve officer, was called into military service in the Signal Corps and spent considerable time out of the country in the South Pacific and European theaters. During his absence, and particularly while in Washington, he was able to keep in close touch with the company affairs and of course continued as one of the two trustees of his father-in-law's trusts, there being in the trust deeds no provision for removal or appointment of successor trustees, as has been previously mentioned. Even while overseas, the defendant was able to give some attention to company problems. He was released from military service in July, 1945 and returned to the company business. Previously he had indicated some dissatisfaction with the title of General Manager, desiring to be an executive officer. In January, 1946, defendant, by arrangement with his co-trustee, became President of the company while the co-trustee became Chairman of the Board.

At this time, the five trusts still held a total of 81,000 shares of common stock out of 142,000 shares outstanding. As of October 1, 1948, the Company gave each common stock holder the right to buy for $10.00 one additional share of common stock for each five shares of common stock then held. Since these rights were all exercised, the company's common stock was thus, at that time, increased from 142,000 to 170,400 shares. It is to be observed that none of the stock purchase rights issued to the co-trustees (including the defendant)

then controlling 57% of the stock, were exercised by the co-trustees in behalf of the trusts, the directors (including the defendant) having decided to issue the rights directly to the income beneficiaries of each trust. As a result of this decision, the percentage of stock held in the five trusts dropped from 57% to 47.6% when the total outstanding shares of the company were increased from 142,000 to 170,400 shares. With respect to the 16,200 shares in each trust, each income beneficiary choosing to exercise the purchase rights became entitled to buy in his individual name 3240 more shares. In the case of plaintiff, who already had 2900 shares of the company stock in her own name, resulting from gifts from her father during his lifetime, she received individual rights to subscribe to 580 additional shares based on stock then owned outright by her. She exercised her rights as to these shares at the price of $10.00 per share, but as to the right to subscribe to 3240 shares which became hers by virtue of the trust, she surrendered these rights to her husband, the defendant. Upon this point, plaintiff's testimony is important. She testified as follows:

"I had to borrow money anyway to buy that 580 shares, and if I bought all I was entitled to, it would have been a lot of money to borrow and (defendant) said: 'You enjoy spending money—spend your money, don't tie yourself up with the bank like that, you sign your rights over to me and I will buy the stock because I can borrow the money and pay it off easier than you can, and everything I have will be yours and the children's some day anyhow.'"

The defendant thus secured plaintiff's preemptive rights which had come to her as beneficiary of the trust and at a time when the book value per share of the common stock was approximately $23.40. He thus acquired very valuable rights which cost him nothing, and which he exercised by purchasing 3239 additional shares of common stock. Whether, as president of the company, he at that time knew that there was likely to be a stock dividend in the near future, is not disclosed by the record. The fact is, however, that the directors of the company subsequently on August 24, 1950, declared a 25% stock dividend which increased defendant's 3239 shares acquired from plaintiff to 4050 shares. This same stock dividend increased the company's outstanding common stock from 170,400 to 213,000 shares and it increased the shares held by the five trusts from 81,000 to 101,250 shares. Plaintiff's trust shares were therefore increased from 16,200 to 20,250 shares but the stock dividend left unchanged the proportion of the stock held in the five trusts, to-wit, 47.6%. With this stock dividend of August 24, 1950, the defendant's total in-

dividual holdings in the company's common stock were increased to 31,781 shares. By this same date, the total value of the company property had increased to $13,132,215.53 and telephones served were 67,490.

Returning to the family situation, so far as plaintiff and defendant were concerned, it has been pointed out that in 1937 the defendant sold the home in which the plaintiff and he had been residing since their marriage and a new home was built which the couple moved into early in the summer of that year. This second home cost approximately $37,000.00 and a small guest house on the property $4500.00. Defendant testified that he paid most of the construction cost of the house and that his wife purchased the furniture at a cost of approximately $10,000 out of her separate estate. Because of the previous outright gifts of stock which the plaintiff and her sisters had received from her father and because of the trust set up in December, 1935, plaintiff's income at least since 1935, has averaged about $10,000.00 per year. Defendant and plaintiff agree that during plaintiff's married life she received income in the total amount of about $200,000.00 and that about $190,000.00 of this amount was spent in the upkeep and maintenance of the home and children. There is no evidence or charge of extravagance by plaintiff.

At the time of filing the divorce petition, the two older children, both boys, were over 21 years of age; the elder having been born in 1925, now married, and the second born in 1929. A third child, a daughter, was born in 1937. Both boys received college educations and the daughter, 13 years of age at the time of the hearing in the trial court, was in school.

During the period of the marriage, defendant testified that maintenance of the home averaged about $9,000.00 per year, and the evidence shows that plaintiff's money, rather than defendant's, in large part maintained the home. The evidence on this point is worth quoting because there was an agreement between plaintiff and defendant that plaintiff should spend her money and that defendant would save his money. This point has importance because the record shows that defendant from time to time had contemplated a divorce from plaintiff. The earliest testimony on this score is that the defendant tried to secure plaintiff's consent to a divorce as long ago as 1940. Having these plans, defendant's freedom from cost of maintenance of the home permitted him to add very considerably to his stock purchases and aided greatly in his accumulation of a fortune. Note defendant's testimony in the record as follows (page 355):

"Q. Wasn't it agreed between you and your wife and didn't you say to her, 'use your money.' Didn't you say, 'there is no use in saving your money, spend it' and you would save yours?

A. I certainly did."

Note also the testimony of the defendant as follows: (Page 356)

"Out of Mrs. Henry's independent income of more than $200,000.00 she has accrued or invested less than $10,000.00."

Plaintiff on direct examination on the subject testified as follows (page 158):

"Q. Was there any talk between you and your husband as to whether you should attempt to save anything out of your income or whether he should save anything out of his income?

A. Now and then I used to say, 'I ought to buy some stock and start investing.' And Cap used to say, 'Just spend what you have got and have fun, you enjoy spending, one person saving in the family is enough and after all, what is the difference, everything I have will be yours and the children's some day.' That he said to me many, many, many times and that, as far as I could see, what was the difference? I didn't mind spending what I had on the house."

We now come to defendant's conduct during the marriage and his extra-marital affairs which caused the trial court to grant a divorce to plaintiff.

The defendant was very frank about his misconduct with women and his lack of fidelity. He testified that his first misconduct was in 1933, 1934, or 1935. The record is replete with names and places and defendant specifically admitted misconduct with three women and numerous additional affairs. In his deposition he admitted marital misconduct as long as twenty years before the divorce hearing, in the case of a young lady referred to as No. 1. The next case was with a secretary who worked for him, referred to in the deposition as No. 2. He admitted that she had been in New York with him. No. 3 involved a young high school girl who had been in the Girl Scout Reserves of which plaintiff was a Counsellor and whom plaintiff had wished to assist through college. She had therefore offered a position to this young girl, 18 years of age, in her home and the defendant, in his deposition, admitted kissing her and "fooling around." The time is placed by him as being in 1935, 1936 or 1937. Plaintiff also testified to discovery of his misconduct, to her own great embarrassment and shame. Defendant's deposition refers to a girl named Stengel, as No. 4. She was a domestic servant

and defendant's mother while visiting at their home at Christmas, 1936, advised plaintiff to dismiss her because of the defendant's too obvious attentions.

The fifth woman with whom the defendant was charged with having been intimate was another secretary of his at the telephone company. This affair lasted over a period of one or two years and eventually the parents of the girl called on defendant and asked him to stop his attentions. It was this young lady who came to the plaintiff in 1940 and asked plaintiff to permit her husband to have a divorce so that defendant could marry her. Defendant admits that he also, at this time, asked his wife for a divorce so he could marry the girl. His wife still had hope of preserving the marriage and she refused the defendant's request. It was in connection with this affair that the postmaster testified that the defendant rented a private postoffice box in the home town which he and this young lady used in order to write letters to each other.

In the case of a woman by the name of Richards, who was another secretary of defendant, the defendant admitted intimacies with her in 1938 or 1939. When asked how long this affair lasted the defendant testified as follows:

"That was the most serious of like instances, perhaps four or five months. She was employed by me."

Evidence in the record, admitted by the defendant, shows numerous gifts to other women, including a stenographer in Washington, for whom the defendant bought a watch at Christmas time in 1940 and to whom he also admitted giving $200.00 which he described as a loan to her when she set up an apartment. During his service overseas, the defendant was billeted in London in an English home where he represented himself to be a widower. Defendant admits that he sent his English landlady $360.00 after his return to this country, but he stated it was in payment for silver candlesticks. In the Spring of 1942, the home town residents who previously had a good many opportunities to observe the defendant's extra-marital activities in the community, saw the defendant's picture in the Saturday Evening Post in an article describing the wartime relaxation of army officers, defendant being shown at a table in the Shoreham Hotel with an unidentified young lady. As a result of this unexpected candid camera shot, the issues of the magazine were sold out promptly in the home town. Thus, one more embarrassment was added to the humiliation suffered by the plaintiff and her children as a result of defendant's indiscretions which had become open and notorious in his home community.

One of the depositions in the court below involved the testi-

mony of a young lady living in Indiana. In the deposition of this girl, taken by plaintiff's attorneys in September, 1950, during the pendency of the divorce action, the young lady, her parents and one of her suitors, gave details of visits to her home by the defendant commencing in May, 1949, and she admitted frequent trips with him by automobile and in his private plane to Cincinnati, Indianapolis and other cities. Defendant had apparently told this young lady that he was separated from his wife. The testimony indicated at least thirty trips to Indiana by defendant to see this individual subsequent to November, 1949. Although in the examination of defendant in the trial court he denied having any plans for remarriage, it appears he married this particular individual since the decree in the court below and before the hearing in this court.

Throughout the entire time of the marriage of plaintiff and defendant, the exemplary conduct of plaintiff has been apparent. Since at least 1937 there was a question in plaintiff's mind as to whether the marriage could last because at least from that time she knew of defendant's attentions to other women. In 1940 came a real crisis when the defendant asked plaintiff for a divorce, so he could marry his then secretary and the secretary, as noted, also came to the plaintiff, requesting plaintiff to release her husband from the marriage. In 1941, plaintiff told of accompanying the defendant to a business convention in Chicago and how during that trip, while she waited in their hotel room, the defendant took a girl out dancing without telling his wife. By chance, plaintiff learned of it and while waiting for his return she testified: "I wondered if it was worth going on—if it wasn't better just to open the window and end it all."

The record is replete with testimony that plaintiff at all times did her utmost to preserve the marriage, at least for the children's sake if not for her own. In the summer of 1949 she and defendant had agreed to take a family trip through Europe for the benefit of the three children. Their ship was only three days out of New York when defendant told plaintiff that she must give him a divorce. Plaintiff requested defendant not to spoil the trip for the children by further discussion of the divorce until they reached home and she wrote in her diary that night, expressing her hope that the marriage would endure: "Having faith, nothing is impossible." With reference to this trip, plaintiff further testified as follows:

"We stayed at beautiful hotels; we had lovely suites of rooms,—when I would see these suites of rooms and know what was ahead of me when I got home I would think, 'it

couldn't be,' and I would break down and naturally the children would wonder, 'what is mother crying about' and sometimes when we would sit down to eat in some lovely spot and I would think about my little family eating together and knew that Cap was planning to leave us, I thought I couldn't stand it."

Even on that trip, and after the humiliations she had frequently suffered at the hands of defendant, she still wanted to maintain the family for the sake of the children. She hoped against hope that as defendant grew older his series of infatuations with other women might come to an end. With infinite patience, understanding and love she brought her husband safely through many crises and she had often been rewarded afterwards by her husband's expressions of regret for various acts of misconduct.

When separated from plaintiff during the war, the defendant, on December 31, 1942, wrote to plaintiff from Washington:

"I don't care one little bit about anyone else beside you, and I would not know what to do without you . . . I love you and only you."

(Plaintiff's exhibit 35)

As late as December 6, 1949, defendant according to another exhibit wrote to plaintiff:

"You are the finest woman I ever hope to know . . . . perhaps too perfect for me."

Upon direct examination by his own counsel, defendant testified as follows:

"(my wife) is undoubtedly, perhaps, the finest woman in the State of Ohio. She is intelligent, she has a sense of humor, a fine sense of motherhood, generous to a fault."

Coming to the financial status of the parties at the time of the divorce hearing, both parties submitted statements of assets and income. There is some difference of opinion as to net worth on the part of the two parties, because of the question of the value of the telephone company stock, comprising so much of the assets of each of the parties. The stock is not listed and there have been only casual sales. Plaintiff's attorneys submitted evidence that defendant's worth is $1,007,833.72, valuing the telephone company stock at $20.00 per share. On this basis his 31,781 shares of common stock of the telephone company are worth $635,620.00 while his wife's 3600 shares in her own name are worth $72,000.00. In addition, he owns preferred stock of the company valued at $100.00 per share amounting to $21,900.00. He has stocks listed in the New York Stock Exchange valued at $51,483.75 and other stocks in the sum of $80,965.00. Besides these stocks he has telephone stock in another company

valued at $176,765.28 as well as other assets of about $40,000.00 including insurance policies with a cash surrender value of $30,779.69. The defendant's average annual income for the three calendar years 1947, 1948 and 1949 was $65,356.76 on the basis of his income tax returns and of his own admissions.

It is claimed by defendant that plaintiff has assets amounting to $422,756.25 as of August 15, 1950, while defendant admits to being the owner of property at the same time of the fair market value of $702,937.32. Plaintiff's income from her own securities, plus the income from her father's trust, has made her the recipient of approximately $25,000.00 per year during the past three years.

With the foregoing facts before it, the trial court granted plaintiff a divorce as prayed for, and, in addition, gave plaintiff custody of the thirteen year old daughter of the parties. The court recognized plaintiff was the owner of a farm of 199 acres inherited from her father and which the defendant, at the time of the inheritance had asked plaintiff to place jointly in his name so he could have the advantages of income tax deductions. The court further found, as to the family residence in the joint names of plaintiff and defendant, that the defendant should give a deed to the plaintiff of his interest in the premises. The court awarded $200.00 per month for the support and maintenance of the minor child.

By way of alimony, the court ordered the defendant to transfer to plaintiff all of defendant's interest in the life insurance policies with a cash surrender value of $30,779.69 and ordered the defendant to continue to pay the premiums thereon, and as additional alimony and for attorney fees and expenses, defendant was ordered to pay the plaintiff the sum of $50,000.00, payable in installments as follows: the sum of $10,000.00 on the 1st day of December, 1950; the sum of $10,000.00 on December 1st of each and every year thereafter until said sum of $50,000.00 should be fully paid. The court further ordered that the defendant keep all property now standing in his name, except the property described and ordered transferred to the plaintiff.

The responsibility of the trial court, in case of a divorce granted because of the husband's aggression, is governed by statute. The two sections of the General Code of Ohio primarily involved are §§11990 and 11991 GC, providing as follows:

"Sec. 11990 GC: When a divorce is granted because of the husband's aggression, the court shall, if the wife so desires,

restore to her any name she had before such marriage, and allow such alimony out of her husband's property as it deems reasonable, having due regard to property which came to him by marriage and the value of his real and personal estate at the time of the divorce."

"**Sec. 11991 GC**: Such alimony may be allowed in real or personal property, or both, or by decreeing to her such sum of money, payable either in gross or installments, as the court deems equitable."

The question before this court is whether the trial court, under the authority granted to it by §11990 GC abused its discretion; in other words, whether the alimony award to the wife in this case was reasonable and proper under all of the circumstances disclosed by the record.

In approaching the question of the reasonableness of the award on the part of the trial court, we believe that it should be kept in mind that a wife who obtains a divorce because of her husband's aggression, loses her dower rights, as set forth in §10502-1 GC, and likewise her right to be supported by her husband as provided by §7997 GC. She also loses the opportunity which would otherwise be hers in the future to share as a wife in the use and enjoyment of the property accumulated by her husband and with her assistance during the marriage. She likewise loses all rights of inheritance, including rights under §10503-4 GC, rights of election under §10504-55 GC and rights to a year's allowance under §10509-74 GC.

In the case of **Batzli v. Batzli, 49 Abs 313**, (decided by the Court of Appeals Seventh District; 1946) the general principles which we recognize are set forth in the syllabus as follows:

"1. The trial court, upon granting the wife a divorce on account of the husband's aggression, and under such conditions as authorized by §11990 GC, should allow the wife such alimony out of the husband's property as the court deems reasonable, having due regard to the property which came to the husband by marriage and the value of his real and personal estate at the time of granting the divorce.

2. The reviewing court may modify the judgment of the trial court by increasing the award of alimony upon concluding from the record that the trial judge did not have due regard to defendant's real and personal estate at the time he granted the divorce and awarded alimony, and that such award is inadequate and insufficient."

See also: **Dornbusch v. Dornbusch, 75 Oh Ap 490** (Fifth District, 1943) and Fronriter v. Fronriter, 26 C. C. (N. S.) 313 (First District 1916, motion to certify overruled Nov. 21, 1916).

In line with the foregoing cases where undisputed facts are brought before the Court of Appeals on a bill of exceptions and the Court has basis for such action in an appeal on law, we find that this Court is authorized under **Ohio Constitution, Art. IV, Sec. 6** and under §§12223-27 12223-38 and 11364 GC, to make such modification of the trial court's judgment as will do more complete justice to the party complaining.

2 **O. Jur.**, "Appellate Review" Sec. 926, p. 1727; 14 **O. Jur.**, "Divorce & Separation" Sec. 126, p. 529. The latter authority thus states the Ohio law:

"The court of appeals is authorized under §11364 GC upon reviewing an alimony decree, to modify the judgment of the trial court with respect to the amount or manner of the allowance when such modification is necessary in order to do more complete justice to the party complaining."

The Cumulative Supplement to **Vol. 14 O. Jur.**, (1951 Pocket Parts) Sec. 126, Sup. p. 64, cites the case of Batzli v. Batzli, supra, in support of this right of modification.

In so declaring we are not unmindful of the cases decided by the Supreme Court of Ohio, including, **In re Estate of Johnson: Morgan et al v. Fink et al, 142 Oh St 49; Bishop v. East Ohio Gas Company, 143 Oh St 541** and **In re Estate of Murnan: Spellman v. Kilbourne, Excr etc., 151 Oh St 529,** which discuss the limitation of the authority of a court of appeals to modify a judgment of the trial court. The first and third cases above mentioned involve the right of the court of appeals to substitute its judgment as to an unliquidated claim for attorney fees in matters arising out of the special jurisdiction of the probate court. In the second case above cited, in an action for damages in an unliquidated amount, the court of appeals found the facts and then modified the judgment of the trial court based on a jury's verdict, by reducing it from $10,500.00 to $4.00. In this latter case, the court of appeals having found facts, was substituting its judgment for the judgment of the trial court and jury.

In the instant case, this court has not retried the case and there was no occasion to do so, because there were no disputed facts, except as to value of the telephone stock and this court's modification by alimony in kind obviates the necessity of finding as to value. No appeal from the lower court's judgment was taken with respect to the divorce and the only point involved on appeal on law is whether the trial court properly applied the provisions of §11990 GC to the admitted facts.

In the case of **Shively v. Shively, 88 Oh Ap 7,** (decided by the Court of Appeals, Second District, 1950) the Court, in com-

menting upon §§11990 and **11991 GC,** pointed out that, although in some jurisdictions the rule is that an award of one-third or one-half of the property of the husband is deemed reasonable and equitable, under circumstances where a divorce is granted to the wife because of the husband's aggression, the modern trend is to award a much larger share to the wife, if the circumstances warrant such larger award. That decision states that the Ohio cases follow the more liberal rule. Since under §11990 **GC,** the court hearing the divorce action is authorized to allow such alimony out of the husband's property as it deems reasonable, this amount will necessarily vary, based upon all of the circumstances of the case, including the nature of the treatment she has had from him in connection with his aggression.

In the instant case, attorneys for plaintiff contend that in view of the difficulties inherent in assigning to plaintiff the defendant's insurance policies and insuring continued payment by him of the premiums, plaintiff in this case has in effect been awarded alimony only in the sum of $50,000,00. Certainly is this true, if the defendant should outlive the plaintiff. Plaintiff's attorneys further point out that this award of $50,000.00 payable $10,000.00 a year for five years, covers both alimony and attorney fees under the journal entry of the trial court dated October 17, 1950. There is no evidence before this Court as to the full extent of the legal services rendered by plaintiff's counsel, but it is apparent from the voluminous record, the depositions and exhibits, that plaintiff's attorneys have rendered important and valuable services and that out of the award by the trial court to plaintiff of $50,000.00 "for alimony, attorney fees and litigation expenses" a sizeable portion will undoubtedly be payable to plaintiff's attorneys for their services.

Plaintiff's attorneys, in their brief, suggest that if their attorney fees are $15,000.00, the remaining balance of the award to plaintiff of $35,000.00 would represent approximately 3.5% of the defendant's assets. In view of the uncontradicted and admitted testimony in this case, this Court finds any such provisions for alimony are unreasonable and grossly inadequate, and that the plaintiff is thereby insufficiently protected. In the case of **Mooney v. Mooney, 48 Abs 29** (Eighth Appellate District, 1947) this court in reversing the trial court's award of alimony in a divorce case, on the ground that the award of alimony to plaintiff wife of $15,000.00 was inadequate and manifestly against the weight of the evidence, pointed out that the award was less than the defendant's gross income for one year. In the instant case,

the $50,000.00 awarded to plaintiff is $15,000.00 less than the average income of the defendant during each of the years, 1947, 1948 and 1949, and we deem it similarly inadequate.

Defendant's attorneys urge that the question of alimony, particularly the amount to be awarded, rests in the sound discretion of the court. This principle is true, provided the award is reasonable. This Court does not have the benefit of an opinion rendered by the trial court in this case, and it, therefore, cannot be aware of considerations given by the trial court to the evidence before it.

A study of the record in this case convinces us that the amount of the award of alimony by the trial court was unreasonable under all of the circumstances set forth.

**Sec. 11990 GC** distinctly provides that the Court in granting a divorce because of the husband's aggression, shall allow such alimony as it deems reasonable **"having due regard to the property which came to him by marriage and the value of his real and personal estate at the time of the divorce."**

The record discloses that the defendant entered marriage with assets of less than one thousand dollars. During the engagement and immediately prior to the marriage, at the suggestion and with the aid of his future father-in-law the defendant invested a few hundred dollars in stocks which he claims shortly thereafter to have been worth $10,000.00. Otherwise, with the exception of not more than $12,000.00 to $15,000.00 inherited from his parents, all of the property of the defendant in excess of one million dollars, has come to him by the marriage and because of opportunities received initially through the plaintiff's family.

Certain of the testimony indicates defendant's view that he has contributed more to make the telephone company successful than the telephone company contributed to him. Conceding that since the death of plaintiff's father in 1937, the defendant made a distinct contribution toward further development of the company, which had previously been successful, we may observe that the defendant's assets increased proportionately more rapidly than the company's assets during the years of his control. This in no way is intended to belittle the defendant's business abilities, but it should be recognized that economic conditions of the country and of the community in which the defendant lived and worked had some share in the continuing success both of the company and of the defendant.

Keeping in mind the statute as our guide, let us note what property came to the husband by the marriage in this case. Chronologically, we may note the following:

(1) As wedding gift, ½ interest in a house

(2) By suggestion of plaintiff's father, between engagement and marriage, investment in stock worth $9,975.00 as a result of a few hundred dollars invested.

(3) Between 1924 and 1927, on advice of plaintiff's father and participating in his father-in-law's plans, stocks of different companies bought up at 75c a share, through exercise of conversion rights, yielded defendant between 12,000 and 15,000 shares of telephone company stock now worth $20.00 per share.

(4) In 1937, appointment of defendant by plaintiff's father on plaintiff's recommendation and upon the defendant's own original request as one of two co-trustees of stock which controlled 57 % of the telephone company in 1948, and 47.6% at the present time, this effective control insuring indefinite, if not permanent, job security to the defendant as president of the company at a salary of $25,000.00 per year. Defendant in his deposition has made it clear he has no intention of resigning as co-trustee of this trust because it insures him the presidency of the company.

(5) Gift of stock purchase rights from wife in 1948 to 3,239 shares and the ensuing stock dividend making a total of 4,050 shares obtained by the defendant growing out of his dual fiduciary capacity as co-trustee and adviser and husband of the plaintiff.

(6) The opportunity granted to the defendant to save his income for continuous purchases of stock, including the telephone company stock, because of being largely relieved of maintenance of the marital domicile by prevailing on his wife to spend her money on the home to the extent of $9,000.00 or $10,000.00 per year, while he saved and accumulated his money on the basis that what he had would one day be hers and the children's. This permitted him to accumulate an additional $190,000.00 or $200,000.00 worth of stocks which he could not have done if plaintiff had not used an equivalent amount of her own money to maintain the home.

In addition to noting the property thus accruing to defendant "by marriage" which is one of the guides specified by §11990 GC, for determining reasonable alimony, the court is directed by that section to consider the value of the husband's real and personal property at the time of granting the divorce. We may note that all of the defendant's assets in this case are readily determinable as to value since they consist primarily of stocks quoted daily on the New York Stock Exchange or over the counter, the only dispute between the

parties being as to the value of the telephone company stock. Accepting plaintiff's valuation, the 31,781 shares of telephone company stock of defendant were worth $635,620.00, and, taking the defendant's valuation, $409,618.44 at the time of the hearing in the court below.

Having come to the conclusion that the trial court's award was grossly inadequate and insufficient under the circumstances, and believing that the trial court failed to allow to plaintiff reasonable alimony, having due regard both for the property which came to the defendant by the marriage, and for the value of his real and personal estate at the time of the hearing, this court modifies the judgment of the trial court in the following respects:

In addition to awarding to plaintiff the defendant's one-half interest in the family residence on East Main Street, Bellevue, Ohio, in addition to finding plaintiff to be the owner of the farm of 199.45 acres in Groton and Oxford Townships, Erie County, Ohio, and in addition to the award of $200.00 per month for the support of the minor child until she attains the age of 21 years or until the further order of court, the foregoing being in line with the decree and judgment of the court below, this court further, instead of awarding to plaintiff as alimony and attorney fees the sum of $50,000.00 in equal annual installments of $10,000.00 each, and instead of awarding to plaintiff the defendant's insurance policies, modifies said decree and judgment of the trial court in the two following respects:

1. This court orders the defendant to deliver and turn over to the plaintiff as and for alimony, 17,915 shares of common stock of the Northern Ohio Telephone Company, out of the 31,781 shares of common stock of said company now in the defendant's name;

2. This Court further orders defendant to pay to plaintiff as and for additional alimony, and for attorney fees and litigation expenses, the sum of $25,000.00 in cash.

This Court, in making the two foregoing modifications of the trial court's decree and judgment, points out the following facts with reference to each modification:

1. The award of 17,915 shares of common stock of the Northern Ohio Telephone Company out of 31,781 shares presently in the defendant's name, has taken into account the fact that 4050 shares of common stock of said company were acquired by defendant at very small cost to him, through stock dividends and exercise of valuable preemptive rights secured by defendant from plaintiff by virtue of defendant's **dual** fiduciary position as co-trustee of plaintiff's trust and

as advisor and husband of plaintiff, and upon the unsolicited assurances given by defendant to plaintiff that whatever was his would be plaintiff's and their children's some day anyway. The award to plaintiff of a total of 17,915 shares of the telephone company common stock, represents 4050 shares plus 13,865 shares or one-half of the balance of 27,731 shares of telephone company stock in defendant's name. This court believes that an award of alimony to plaintiff in kind in this manner obviates any question of deciding as between plaintiff and defendant the value of this particular stock. In reaching this determination and awarding to plaintiff a total of 17,915 shares of common stock of the telephone company, founded by plaintiff's father, this court has had in mind also the value of the defendant's other assets at the time of the hearing in the trial court in the undisputed amount of $372,263.00 and that the award in kind to plaintiff is reasonable and proper, having due regard to the property which came to the defendant by marriage and the value of his real and personal property at the time of the divorce.

2. With respect to the further award to cover additional alimony, attorney fees and expenses of litigation, of $25,000.00 in cash, this award is made to plaintiff in lieu of and instead of the award to plaintiff by the trial court of the interest in defendant's existing insurance policies which latter award has appeared to this court difficult of enforcement because of possible failure of defendant to keep up premiums and of no value whatsoever to plaintiff or her children in the contingency that she should pre-decease the defendant.

For the foregoing reasons, the judgment of the trial court is modified, and as modified the same is affirmed. Exceptions noted. Order see journal.

SKEEL, PJ, HURD, J, concur.